WHEELER et al. v. CITY AND COUNTY OF DENVER et al.[*]

(Circuit Court of Appeals, Eighth Circuit. February 10, 1916.)

No. 4286.

1. MUNICIPAL CORPORATIONS ⬦═931—BOND ISSUES—VALIDITY—APPLICATION OF CHARTER.

Denver Charter, § 264a, as amended in 1910, relative to the purchase or construction of a waterworks system and the issuance of bonds for that purpose, provides that nothing in the preceding sections or in the charter, except as therein specifically provided, shall apply to the acquisition or operation of a waterworks, and that any provisions of the charter in conflict therewith are thereby repealed. *Held*, that the validity of bonds issued thereunder must be determined from that section alone, especially as the electors knew of existing trouble between the municipality and a water company, and in amending the charter legislated particularly with reference thereto.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1944–1947; Dec. Dig. ⬦═931.]

2. MUNICIPAL CORPORATIONS ⬦═931—ISSUANCE OF BONDS—SUBMISSION TO VOTE—OPERATION AND EFFECT.

Denver Charter, § 264a, as amended in 1910, created a public utilities commission, authorized the creation of an indebtedness in the sum of $8,000,000 to provide a municipal water plant, such indebtedness to be evidenced by bonds, and provided that, if a water company did not take advantage of its provisions as to selling its system to the city, then at a special election to be held as therein stated there should be submitted to the taxpaying electors the question of issuing $8,000,000 in bonds for the construction of a new municipal water plant. *Held*, that bonds authorized at such an election are not void because of the fact that a complete system of waterworks cannot be constructed for $8,000,000, as there is no provision in the charter prohibiting the issuance of the bonds unless a complete system can be built with the proceeds, and, while it would be unwise for the commission to start the construction of the system under the circumstances without obtaining authority from the voters for the issuance of additional bonds, the courts possess only judicial power, and may not correct unwise legislation or unwise official action.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1944–1947; Dec. Dig. ⬦═931.]

3. MUNICIPAL CORPORATIONS ⬦═931—ISSUANCE OF BONDS—SUBMISSION TO VOTE—CHARTER PROVISIONS.

Denver Charter, § 264a, as amended May 17, 1910, creates a public utilities commission, gives it all the powers of the municipality in the matter of constructing, purchasing, condemning, and acquiring a water plant or system, authorizes the creation of an indebtedness in the sum of $8,000,000 to provide such system, when authorized by a vote of the taxpaying electors, and provides that if a water company, on or before July 1, 1910, shall place a deed of its property in escrow, with a direction to deliver it to the commission in exchange for $7,000,000 of bonds, the commission shall file its acceptance, and at a special election to be held on the first Tuesday in September, 1910, there shall be submitted the question of issuing $8,000,000 in bonds for the purchase and repair of such

⬦═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

[*] Rehearing denied May 16, 1916.

system, and that if the water company fails to comply therewith there shall be submitted at such election the question of issuing such bonds, to be sold or used for the construction of a new municipal water plant. A subsequent paragraph provides that the commission, immediately upon its election, in case the water company has not accepted the $7,000,000 in bonds, shall make a careful investigation of the value of such plant, and a careful estimate of the cost of constructing a new water system, and may submit an alternative proposition at such election for the issuance of bonds in such sum as it may deem advisable for the acquisition or construction of a water plant in any of the ways within its powers. *Held*, that it was discretionary with the commission whether it would follow this last paragraph, or the preceding one, and its failure to act under the last-mentioned paragraph did not invalidate bonds authorized at an election at which the question of issuing $8,000,000 in bonds for the construction of a new system was submitted, especially as the time between July 1st and the date of the election was entirely insufficient for a careful investigation of the value of the existing plant and the cost of a new system.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1944–1947; Dec. Dig. ☞931.]

4. MUNICIPAL CORPORATIONS ☞918(1)—ISSUANCE OF BONDS—SUBMISSION TO VOTE—CHARTER PROVISIONS.

As the charter authorized the creation of an indebtedness to provide a municipal water plant upon a vote of the taxpaying electors, and provided that the question actually submitted should be submitted, the failure of the commission to ascertain the probable cost of such system prior to the special election did not render the vote nugatory.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1919; Dec. Dig. ☞918(1).]

5. MUNICIPAL CORPORATIONS ☞918(1)—ISSUANCE OF BONDS—SUBMISSION TO VOTE—CHARTER PROVISIONS.

It was sufficient to submit to the taxpaying electors the question which the law required to be submitted, and the commission's failure to fix the date, form, and maturity of the bonds, as authorized by the charter, prior to the special election, did not affect the validity of the bonds.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1919; Dec. Dig. ☞918(1).]

6. MUNICIPAL CORPORATIONS ☞918(1)—ISSUANCE OF BONDS—SUBMISSION TO VOTE—CHARTER PROVISIONS.

The bonds were not void because of the commission's failure to state in the proposition submitted to a vote how it proposed to create a sinking fund for the payment of the principal and interest on the bonds.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1919; Dec. Dig. ☞918(1).]

7. MUNICIPAL CORPORATIONS ☞918(1)—ISSUANCE OF BONDS—SUBMISSION TO VOTE—CHARTER PROVISIONS.

An ordinance of the city of Denver provided for a tax sufficient to pay the annual interest on bonds authorized to be issued for the purpose of constructing a waterworks and to provide a sinking fund to extinguish the principal at maturity, and further provided that when the plant should have been constructed so much of the revenue as was not needed for the operation and maintenance of the plant should be paid into the sinking fund, and that no part of the levy should be utilized in the extinguishment of principal and interest until such revenues were exhausted. It was contended that the law only authorized the public utilities commission to provide for a sinking fund to be created out of the net earnings of the water plant. *Held*, that the bonds were not invalid merely

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

•

because the commission and council made a provision for a sinking fund that might not have been necessary.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1919; Dec. Dig. ☞918(1).]

8. **MUNICIPAL CORPORATIONS** ☞920—**ISSUANCE OF BONDS—SUBMISSION TO VOTE—CHARTER PROVISIONS.**

Denver Charter, § 264a, as amended in 1910, authorizes the creation of an indebtedness in the sum of $8,000,000 to provide a municipal water plant, such indebtedness to be evidenced by bonds maturing at such times as may be prescribed by the public utilities commission, thereby created, and provides that such bonds may be called for redemption and redeemed by the commission as provided in another section. *Held*, that this provision as to redemption does not deprive the commission of authority, in determining when the bonds shall mature, to determine that they shall be straight 30-year bonds.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1930, 1931; Dec. Dig. ☞920.]

9. **MUNICIPAL CORPORATIONS** ☞918(1)—**ISSUANCE OF BONDS—SUBMISSION TO VOTE—CHARTER PROVISIONS.**

The failure of the commission to determine whether the bonds were to be straight 30-year bonds or call bonds prior to the election, and to inform the taxpayers thereof before the submission to them of the question of issuing such bonds, did not invalidate the bonds, as it was sufficient to do what the law commanded, and the law did not require that the taxpayers be informed whether the bonds would be straight bonds or call bonds.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1919; Dec. Dig. ☞918(1).]

10. **TRIAL** ☞56—**RECEPTION OF EVIDENCE—CUMULATIVE EVIDENCE.**

It was not error to exclude evidence which was merely cumulative, because the record already showed the facts desired to be proved.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 131, 132; Dec. Dig. ☞56.]

Appeal from the District Court of the United States for the District of Colorado; Robert E. Lewis, Judge.

Suit by Clara A. Wheeler and another against the City and County of Denver and others. From a decree dismissing the bill, complainants appeal. Affirmed.

The bill in this case was filed by appellants June 21, 1911, in behalf of themselves and all other taxpayers of the city and county of Denver, Colo., similarly situated, who might come in and contribute to the expenses of the action, for the purpose of having $8,000,000 of bonds voted by the taxpaying electors of the city and county of Denver on the first Tuesday of September, 1910, declared null and void, and their issuance by the public utilities commission perpetually enjoined. There was a motion made by appellees to dismiss the bill on the ground that it did not involve a dispute or controversy properly within the jurisdiction of the court, for the reason that the parties had been collusively joined for the purpose of attempting to create a cause cognizable under the laws of the United States. The motion was granted. On appeal this decision was reversed. Wheeler v. Denver, 229 U. S. 342, 33 Sup. Ct. 842, 57 L. Ed. 1219.

When the case was remanded a supplemental bill and amendment was filed without objection. The case subsequently came on for trial, and counsel for appellees made admissions in open court as follows:

"We admit that there was no attempt made by the public utilities commission to comply with the provisions of article 9 of the charter in existence prior to the amendment of section 264a. We insist that section 264a super-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

seded the provisions of article 9 which have been alleged in this bill, and that all our proceedings and all our acts were taken under the express terms and provisions and authority of section 264a. We admit that we did not submit at the election in September, 1910, any question, or cause to be submitted any question, excepting the question of whether or not the taxpaying electors, wished to issue $8,000,000 of bonds for the purpose of constructing an independent water plant. We admit that there was no special report, or no special investigation, aside from the general investigation, made by the members of the utilities commission between the 1st day of July, and the time of the enactment of the ordinance calling the special election or prior to the special election in September, 1910, in relation to the valuation of the plant of the Denver Union Water Company, or in respect to the question of whether or not an independent plant could be constructed within the limits of the bonds provided and authorized by section 264a."

"We further are willing to admit that the utilities commission submitted no alternative proposition, but they reported to the election commission that there was no alternative proposition to be submitted, and that the vote was taken without the submission of an alternative proposition, insisting that the question of the submission of an alternative proposition lay entirely within the discretion of the public utilities commission. We take the position that section 264a covers the entire matter, and we admit that we have at all times acted under, and particularly with reference to the terms and provisions of section 264a, using that section for the authority of the public utilities commission, and complying in all respects with the terms of that section, and that we have not acted otherwise than under it."

"That up to the time of the election on the 6th day of September, 1910, there was nothing in the minutes or records of the public utilities commission showing that they had up to that time made any estimates, or made any plans, or made any surveys, or taken any other steps toward ascertaining the cost or fixing the cost, or adopting the maximum cost, or any cost, of a water plant for the city of Denver."

Counsel for appellants then called as a witness John R. Freeman, a civil engineer, whose qualifications to testify were undoubted, and after several questions had been asked him which he was not permitted to answer, counsel made the following offers of proof:

"We now desire to make an offer of proof and show by the witness now on the stand that he has made a careful and exhaustive investigation of the situation in the city of Denver and of the available water supplies for the use of the city of Denver and its inhabitants for domestic supplies, and that his examination has covered a period of several years, beginning in 1907, and during the present year has brought his investigation down to date; that he is familiar, after having made such an investigation, with the conditions, and the situation and the cost of the installation of a water plant such as would be necessary to furnish and supply the city of Denver with water for all uses and purposes for all the inhabitants of the city; and that the cost of such a plant, as is required by the terms of section 264a, or any adequate reasonable plant, would range from a minimum of $15,000,000 to $20,000,000, depending on whether or not it was deemed advisable to cross the range of mountains for the water supply."

"We offer to prove by the witness now on the stand, further, that he is familiar with the present water plant now furnishing water to the city and county of Denver, and that the cost of duplicating the present plant would be in excess of $16,000,000.

"And we offer further to prove by this witness now on the stand that the value of the present plant—its reasonable present value is approximately $15,-000,000."

"We offer further to prove by this witness now on the stand that that system of waterworks such as is required by section 264a that would be a proper and satisfactory system cannot be built for $8,000,000."

"We offer to prove that such a plant could not be built at any time in the year 1910, nor at any time subsequent to 1910, nor can it now be built, for $8,000,000, or any amount less than $16,000,000."

"We also offer to prove by the witness now on the stand that upon per-

sonal investigation there are no available reservoir sites within a reasonable distance from the city of Denver that can be utilized for the conservation of a water supply for a water plant for the city of Denver that could be built for any reasonable amount, such as would be required in a plant to cost $8,-000,000."

"We offer to show that upon a personal investigation by the witness now upon the stand that there are no available reservoir sites at any cost whatever that could be used for a plant to be established for the city and county of Denver."

"We also offer to prove that it is financially impossible and physically impossible to acquire a water supply of sufficient volume at any point from the other side of the range of mountains for use in the city of Denver."

"We offer to show by this witness that, upon investigation which he has made, it is now impossible for the city and county of Denver to acquire any independent water for the use of a water plant for the city and county of Denver, or a new water plant for the city and county of Denver, and that such waters cannot be obtained from any source other than the water now owned by the Denver Union Water Company."

"And that no water outside of the watershed of the Platte river can be obtained for the city and county of Denver."

"And that the water of the Platte—watershed of the Platte river—has been appropriated several times over, and the water cannot now be obtained except at prohibited cost."

"We offer to show by the witness that it would cost to exceed $4,500,000 to place in the city and county of Denver a distributing system for the water." .

Counsel then offered to show the same facts by witnesses M. L. Holman and George G. Anderson. These offers were all objected to by counsel for appellees as incompetent, irrelevant, and immaterial. The objections were sustained and exception allowed. A. Lincoln Fellows, a member of the public utilities commission and one of the defendants in this case, was called as a witness by appellants and asked the following question: "I will ask you if there is in the minutes of the public utilities commission any resolution adopting any particular plan for the construction of a new and complete water system for the city and county of Denver as required by section 264a prior to the 6th day of September, 1910."

The witness was permitted to answer, and he stated: "I do not remember any such resolution. I don't think there is one."

Henry W. McElravy was called as a witness by counsel for appellants for the purpose of identifying certain memoranda which he had taken from the minutes of the commission. The memoranda were offered to be introduced in connection with the testimony of the witness for the purpose of showing that the commission prior to the election on September 6, 1910, had taken no action with respect to the investigation of a source of water supply, or made any estimate of the cost of acquiring or constructing a water system for the city and county. These memoranda on objection were excluded and an exception allowed.

Counsel on each side then rested their case, whereupon the court dismissed appellant's bill with costs. This appeal is from the judgment dismissing the bill. The bill alleged and the answer admitted that on August 3, 1913, the public utilities commission passed the following resolution:

"On motion of Mr. Anderson an advisory committee, consisting of A. Lincoln Fellows, C. P. Allen, and E. C. Van Diest, were appointed to act as an engineering committee, under the direction of this commission, for the purpose of making careful study of the present value to the city of the Denver Union Water Company's holdings, and of the proposed projects for furnishing water from the western slope for Denver, and the various storage projects on the South Platte river and its tributaries, and of making estimates of the cost of acquiring or constructing a complete water system for the city of Denver, by any of the methods proposed, taking into consideration the water supplies available, and to make verbal progress reports from time to time as may be desired, and write a final report at the earliest possible date

to this committee, and thereafter directed that the services rendered by said board be paid by the city and which said payment has been made."

The bill further alleged, and the answer admitted, that said board of engineers reported as follows with respect to a new plant: "It should be possible to construct a new water system complete, in serviceable operation and providing service in five years for $12,750,000."

Counsel for appellees, Mr. Nye, in answer to a question from the bench when this appeal was being argued, admitted that a new water system complete for the city and county of Denver, could not be constructed for $8,000,-000. The bill alleged: "That a complete water system, such as is required by the provisions of section 264a, of article 9, cannot now, and could not at the time of the adoption of said section, be constructed or completed for said sum of $8,000,000, or for any sum less than $12,750,000, and, with any adequate water supply, $16,000,000." And this allegation does not seem to have been denied by the answer.

Section 264a of the charter of the city and county of Denver, which authorized the issuance of the bonds in question, reads as follows:

### Paragraph 1.

"Section 264a. Nothing in the preceding sections or in this charter, except as herein specifically provided, shall apply to the acquisition or operation of a waterworks for supplying the city and county of Denver and its inhabitants with water for all uses and purposes, but a public utilities commission is hereby created, to consist of three members, to have complete charge and control thereof, and to have and exercise all the powers given to the board of public works in chapter IX, as to all public utilities."

### Paragraph 2.

"Except as herein provided, each member of said commission shall be elected for a term of six years and shall serve until his successor is elected and qualifies, and his salary shall be four thousand dollars per annum, payable in equal monthly installments by the treasurer out of the general fund upon the warrant of the commission, and Armour C. Anderson, Edwin Van Cise and A. Lincoln Fellows are hereby elected as the first members of said commission to serve, in the order named, from the date of their election to June 1, 1912, June 1, 1914, and June 1, 1916, respectively, and until their successors are elected and qualify. The names of all candidates hereafter nominated for members of said commission shall appear on the official ballot without any party designation in connection therewith. Each commissioner shall give bond in the sum of $10,000 in the manner provided in section 152 of the charter."

### Paragraph 3.

"Said commission shall have power to employ a secretary and such legal and technical help as it may deem necessary, and shall, subject to the civil service provisions of this charter, hire all other employés, and shall fix and pay all salaries and wages and shall fix and collect all rates and charges for any service under its control, which rates and charges shall be made as low as good service will permit. Said commission may adopt reasonable rules and regulations, with reference to such service. It shall make an itemized monthly statement of all moneys received and paid out by it, a copy of which it shall file with the city auditor, and shall daily turn over to the city treasurer, as provided in section 260 the money received by it, said money to be paid out by the treasurer only upon the warrant of said commission. Said commission shall have and exercise all the powers of the city and county granted in the constitution or named in the charter in the matter of constructing, purchasing, condemning and purchasing, acquiring, leasing, adding to, maintaining, conducting and operating a water plant or system for all uses and purposes and everything pertaining or deemed necessary or incidental thereto. It shall institute and defend all litigation affecting its duties and powers or in relation to its trusts and all expenses thereof shall be paid by the treasurer out of the general fund upon the warrant of the commission,

and it may also call to its assistance the city attorney or any other department of the city government."

### Paragraph 4.

"Except as in this section provided, the city and county shall never purchase or acquire or exercise any option, right, privilege or power of purchasing or acquiring any water plant or system from any person, persons or corporation except upon a vote of the qualified electors first had and obtained authorizing the same, and wherever in any ordinance or contract the former city of Denver was given the right, or the city and county now has the privilege or power to purchase or acquire any water system or plant or to extend any contract with reference thereto, the term 'city' used in any such ordinance or contract shall be taken and held to mean the qualified electors of the city and county and not otherwise. No plant owned, acquired or constructed by the city and county and no water rights owned or acquired by the city and county shall ever be sold, leased or otherwise disposed of except upon a vote of the qualified electors first had and obtained, and the same shall be under the sole control and management of said commission.

"Any member of said commission may be recalled and his successor named at any time in the manner provided by the recall section of this charter. Any vacancy shall be filled by the remaining members of the commission and such appointee shall serve until the next municipal election and until his successor is elected and qualifies."

### Paragraph 5.

"Upon a vote of the taxpaying electors authorizing the same, as hereinafter provided, the city and county of Denver, shall and it does hereby authorize the creation of an indebtedness in the sum of eight million dollars to provide a municipal water plant or system and everything incidental or necessary thereto for supplying the city and county and its inhabitants with water for all uses and purposes, said indebtedness to be evidenced by its bonds of the par value of eight million dollars, in convenient denominations of not more than one thousand dollars each and bearing four and one-half per centum interest per annum of such date and in such form maturing at such times as may be prescribed by said commission. The council shall pass such ordinances as said commission may deem necessary respecting the issuance of said bonds or to the full exercise of all the power given it, in the form recommended by the commission, and without amendment, and the mayor shall sign the same. Said commission shall issue said bonds only from time to time as they are required for actual use or sale, and the mayor shall sign them and the clerk shall sign and attest them under the seal of the city and the auditor shall register them, with the approval of the president of said commission indorsed thereon. No such bonds shall be used or sold at less than par, nor sold except after advertisement as in this charter provided for the sale of public improvement bonds, and they may be called for redemption and redeemed by the commission in like manner as provided in section 314."

### Paragraph 6.

"If the Denver Union Water Company shall place in escrow with the Continental Trust Company of Denver, on or before July 1, 1910, a good and sufficient deed of conveyance from said water company to the city and county of Denver for all the property of every description included and embraced in the appraisement made under Ordinance 163, Series of 1907, free and clear of all liens, incumbrances, claims and demands of every kind and character, accompanied by a valid surrender and release of any and all rights, claims and demands said company or any of its subsidiary, associated or affiliated companies may have against the city and county or against any of said property, with direction in writing to deliver the same to said commission in exchange for seven million dollars of said bonds at par, then the commission shall file its acceptance with said trust company and the same shall constitute a binding contract of purchase. In that event then at a special election which the council shall call within sixty days after the adoption of this amendment, to be held on the first Tuesday in September, 1910, there shall be submitted to the qualified taxpaying electors the question of issuing the

said eight million dollars in bonds, of which seven million dollars at par shall be delivered to said trust company as aforesaid and the other one million dollars of bonds, or so much thereof as may be deemed necessary, shall be sold or used by the commission to improve, repair and add to the water plant so purchased. The ballot shall have printed on it the words, 'For the issuance of eight million dollars in bonds for the purchase and repair of the existing water plant under the provisions of section 264a of the charter,' and on a separate line the words, 'Against the issuance of eight million dollars in bonds for the purchase and repair of the existing water plant under the provisions of section 264a of the charter,' with a space opposite each such line in which the voter may make his mark indicating his vote."

### Paragraph 7.

"In case the Denver Union Water Company shall fail or refuse to fully comply with all the foregoing provisions as to the things to be done and performed by it, then at the special election aforesaid, in lieu of the foregoing question, there shall be submitted to the qualified taxpaying electors on the ballot the question of issuing eight million dollars in bonds to be sold or used to construct and put into operation a complete system of water works for supplying said city and county and the inhabitants thereof with water for all uses and purposes. Said ballot shall have printed on it the words, 'For the issuance of eight million dollars in bonds for the construction of a new municipal water plant,' and on a separate line the words, 'Against the issuance of eight million dollars in bonds for the construction of a new municipal water plant,' with a space opposite each such line in which the voter may make his mark indicating his vote. Such bonds, or so much thereof as the commission may deem necessary, shall be sold or used by it to construct and put into operation a complete system of water works for supplying said city and county and its inhabitants with water for all uses and purposes, and said commission shall forthwith proceed to construct the same."

### Paragraph 8.

"The said commission shall immediately upon its election, in case the Denver Union Water Company has not accepted the seven million dollars in bonds for its plant as aforesaid, proceed to make a careful investigation of the value of said plant for the uses and purposes of the city and county of Denver and its inhabitants, and also proceed to make a careful estimate of the cost of constructing a complete new water system for the city and county of Denver and the inhabitants thereof and may submit an alternative bond proposition at said special election for the issuance of bonds in such sum as it may deem advisable for the acquisition or construction of a water plant or any part thereof by any of the ways within its powers herein mentioned, and the same shall be placed on said ballot in such form as said commission may determine, and it may also submit any proposition concerning its powers or trust at any municipal election in like manner. If a majority of the votes cast thereon shall be in favor of any proposition submitted it shall thereby be adopted, and in case alternative propositions are submitted, and each receive a majority, then the one receiving the greater affirmative vote shall be the one adopted. Such adoption shall be a sufficient authorization for the issuance of the bonds thereby provided for and the same, when issued, shall be and constitute an indebtedness of the city and county of Denver for the purposes aforesaid, and the provisions in this section relative to the issue, sale and redemption of bonds shall apply thereto. Any provisions of the charter in conflict herewith is hereby repealed."

For the purpose of reference the section has been divided into paragraphs numbered from 1 to 8, inclusive.

It is admitted by the answer to the bill that the public utilities commission under and by virtue of the authority conferred by said section 264a, caused to be prepared and introduced in the city council for the city and county of Denver an ordinance which was duly passed and approved by the mayor of said city and county on July 6, 1910, and known as No. 98, Series of 1910, calling and requiring the holding of an election on the first Tuesday of September,

1910, for the purpose of submitting to a vote of the qualified electors the question of issuing $8,000,000 in bonds for the construction of a new municipal water plant; that thereafter, in pursuance of said ordinance, on the first Tuesday in September, 1910, to wit, on September 6th, in said year, said election was held with the result that the issuance of said bonds was approved by a majority of the persons voting upon said question. The answer also admitted that in all proceedings taken by appellees in respect to the passage of said ordinance, the holding of said election, and the authorization of said bond issue, they proceeded under the provisions of section 264a, and without regard to original article 9 of the existing charter of the city and county of Denver. The answer also admitted that the only question submitted to the qualified electors at the election held September 6, 1910, was in the following form: "For the issuance of eight million dollars in bonds for the construction of a new municipal water plant." "Against the issuance of eight million dollars in bonds for the construction of a new municipal water plant"—and that no other question was submitted by the public utilities commission or otherwise.

It is also conceded that the Denver Union Water Company never at any time complied with the provisions of that portion of section 264a, designated as paragraph 6 herein.

Edwin H. Park, of Denver, Colo. (Henry A. Lindsley, of Denver, Colo., on the brief), for appellants.

Clayton C. Dorsey, of Denver, Colo., amicus curiæ.

George L. Nye and James A. Marsh, both of Denver, Colo., for appellees.

Before CARLAND, Circuit Judge, and AMIDON and VAN VALKENBURGH, District Judges.

CARLAND, Circuit Judge (after stating the facts as above).  [1] So far as the legality of section 264a as a law is concerned we think the objections urged in the bill were all decided adversely to the contentions of appellants in Denver v. New York Trust Co., 229 U. S. 123, 33 Sup. Ct. 657, 57 L. Ed. 1101. It was there said:

"That section 264a was merely an amendment of the charter, and that the mode of its submission and adoption was in accord with the applicable restrictions of the state Constitution," and "that the amendment supersedes pro tanto the original provisions of the charter with which it is not in accord. The purpose in adopting it was to introduce something new, to make a change in existing provisions, and being adopted conformably to the constitutional and charter requirements, the new or changed provisions became at once a part of the charter, thereby supplanting or modifying the original provisions to the extent of any conflict."

We also are of the opinion that in view of the language of paragraph 1 of section 264a, and of the general repealing clause at the end of the section, that the validity of the bonds in question, so far as the questions raised in this case are concerned, must be determined from an examination of said section and that alone. We are strongly persuaded to adopt this view not only from the language used but from a consideration of the fact that the electors of the city and county of Denver knew of the trouble existing between the city and county of Denver, hereinafter called city and county, and the Denver Union Water Company, hereinafter called water company, and that they legislated particularly with reference thereto and specifically said:

"Nothing in the preceding sections or in this charter, except as herein specifically provided shall apply to the acquisition or operation of a waterworks for supplying the city and county of Denver, and its inhabitants with water for all uses and purposes."

[2] The first and important contention of appellants why the bonds must be declared void may be stated as follows: The city and county and the public utilities commission, hereinafter called commission, are both without power to issue bonds except as specific authority may be conferred in each instance by vote of the qualified taxpaying electors. This authority when conferred must be strictly construed, and all reasonable doubt of its existence must be resolved against the granting of the power. In the case at bar the qualified taxpaying electors authorized the issuance of $8,000,000 in bonds on condition that they should suffice to provide a municipal water plant or system, and everything incidental or necessary thereto, or construct and put into operation a complete system of waterworks for supplying said city and county and the inhabitants thereof with water for all uses and purposes; that the taxpayers have never voted upon the question of issuing $8,000,000 in bonds to construct a partial or incompleted plant, to finish which and make it usable, would cost a much larger sum, and that to hold that they so voted would sanction a manifest fraud upon the taxpayers. Therefore the issuance of the bonds should be enjoined because upon the record it is admitted that a complete system of waterworks cannot now be and never could have been constructed for $8,000,000. In the consideration of this contention we are of the opinion that we must hold on the record before us that a complete system of waterworks such as would be required to supply the city and county with water, cannot be constructed for $8,000,000.

This court, however, possesses only judicial power. It may not legislate nor correct merely unwise legislation or unwise official action. No one can read section 264a without reaching the conclusion that the taxpaying electors understood that $8,000,000 would construct and put into operation a complete system of waterworks for supplying the city and county and the inhabitants thereof with water for all uses and purposes. Paragraph 8. But are the bonds voted void because the amount of bonds authorized will not construct and put into operation a complete system of waterworks? What rule of law has been violated in the estimate made by the electors as to the amount required to construct and put into operation a complete system of waterworks? What rule of law has been violated conceding the electors made a mistake as to the amount required for the purpose mentioned? It may be conceded that it would be unwise for the commission to start the construction of a waterworks system with only a part of the expense authorized. But as has been stated the judicial power cannot reach merely unwise official action.

It would seem to be the duty of the commission or the city and county to go back to the electors for authority to issue additional bonds; but the judicial power does not extend to compelling the performance of official duty where a discretion is involved. It is urged

as a legal ground for holding the bonds void, that to decide otherwise would be to sanction a manifest fraud on the taxpayers. We do not intend to sanction a fraud upon any one, nor do we, when we decide that the evils complained of on this branch of the case are beyond our reach. In order to hold the bonds void for the reason now being discussed, we would be compelled to construe section 264a as providing either directly or by clear implication that the bonds should not be issued or used unless a complete system of waterworks could be built for $8,000,000. If this was the idea of the electors it would have been an easy matter to have inserted in the section language to the effect, that in case it was found that $8,000,000 would not construct a complete waterworks system that the bonds should not be issued or used. No such proviso was so inserted, and we have no authority so to do. It certainly cannot be the law that simply because the electors authorizing a bond issue have made a mistake as to the amount of bonds required to construct any public improvement, that therefore the bonds are void, in the absence of any legislation or provision that they shall be void in case the public improvement shall cost more than the amount of bonds authorized. It is rather the exception than the rule that public improvements are built within the limit of the amount of money appropriated therefor.

Counsel for appellees cite the case of People ex rel. Murphy v. Kelly, 76 N. Y. 475, in support of the proposition that even if it is conceded that the waterworks system for the city and county cannot be constructed and completed for $8,000,000, that fact would not prevent the issuance of the $8,000,000 already voted, and the commencement of the waterworks system by the commission. In the case cited the trustees of the New York and Brooklyn Bridge had made two requests for money with which to construct the Brooklyn Bridge, of the mayor and comptroller of New York, amounting in the aggregate to $1,000,000. These requests were resisted on the ground that the proviso in the act of the Legislature of New York of 1875 (Laws 1875, c. 300) provided:

"That the whole amount to be paid by both cities [Brooklyn and New York] shall not exceed eight millions of dollars."

It was claimed by the comptroller that the bridge although partially constructed could not be completed for the sum of $8,000,000, and as the cost was limited by law to $8,000,000 no more money should be paid to the trustees.

The action was one in mandamus to compel the payment of the calls made by the trustees of the New York and Brooklyn Bridge. The Court of Appeals of New York, by a divided court, decided that the limitation of the amount to be paid contained in the proviso above mentioned did not prohibit the trustees from proceeding with the construction of the bridge, for the reason that if it had been intended that the trustees should not enter upon the completion of the bridge without first determining whether or not it would cost more than $8,000,000, a matter of such controlling importance would have been expressed in plain and explicit language.

This is along the line of reasoning which we have advanced in reference to section 264a. In regard to the Brooklyn Bridge Case, however, it must be said that at the time the act of 1875 was passed which contained the proviso above mentioned and other matters in connection with the building of the Brooklyn Bridge, there had already been expended upon the bridge about $5,000,000, and there was greater reason for the court to hold in that case that the Legislature of New York did not mean by the proviso above mentioned that the structure then partially completed, upon which upwards of $5,000,000 had been expended, should be lost and rendered worthless unless the expense of its completion could be kept within the sum mentioned. In the case at bar the bonds have not been issued and no work has been done as we understand it, towards the construction of a complete waterworks system, so that the conditions which existed in the Brooklyn Bridge Case do not exist here.

We prefer to place our judgment in overruling the contention now under discussion upon the principle that the bonds in question being within the limit authorized by the votes of the taxpayers, may not be held void merely because a complete system of waterworks will cost more than the amount of the bonds voted, in the absence of some express provision or clear implication that the waterworks system was not to be constructed unless it could be constructed for $8,000,000. Paragraph 7, under which the bonds were voted, provides:

"Such bonds, or so much thereof as the commission may deem necessary, shall be sold or used, by it to construct and put into operation a complete system of waterworks for supplying said city and county and its inhabitants with water for all uses and purposes, and said commission shall forthwith proceed to construct the same."

[3] It is next contended that by virtue of the language of paragraph 8, section 264a, that the investigation and determination by the commission of the value of the water company's plant, and the cost of constructing a new complete plant, was a condition precedent to be performed prior to the vote, which authorized the issuance of the bonds, and the nonperformance of these duties by the commission rendered the bonds so voted void. In regard to this contention, it is manifest that the failure of the water company to in any way comply with paragraph 6, section 264a, rendered it impossible for the council to submit to the qualified taxpaying electors the question of issuing $8,000,000 in bonds for the purchase and repair of the waterworks of the water company. In this condition of affairs there was submitted at a special election called as provided in paragraph 6 the question provided in paragraph 7, and as a result thereof the bonds in question were authorized. The question then is, was it lawful to submit the question provided for in paragraph 7 at the special election provided for in paragraph 6, or was the commission after the water company had failed and refused to comply with paragraph 6 confined absolutely to the provisions of paragraph 8.

Section 264a became a law May 17, 1910. By its terms the water company was to place in escrow a good and sufficient deed of conveyance of its waterworks on or before July 1, 1910. A special elec-

tion was to be held on the first Tuesday in September, 1910, in case the deed of conveyance of the water company should be deposited in escrow, as above stated, for the purpose of determining whether $8,000,000 in bonds should be issued to purchase and repair the existing water plant. This question was not submitted at the special election as the water company did not deposit its deed as provided in paragraph 6, but under paragraph 7 in lieu of the question stated in paragraph 6, the question in paragraph 7 was submitted at said special election.. The language of paragraph 7 in regard to the submission of the question therein provided for uses the words "shall be submitted." Paragraph 8 provides that the commission, in case the water company has not accepted $7,000,000 for its plant, as provided in paragraph 6, shall proceed to make a careful investigation of the value of said plant for the uses and purposes of the city and county, and its inhabitants, and also proceed to make a careful estimate of the cost of constructing and completing a new waterworks system for the city and county and the inhabitants thereof, and that said commission may submit an alternative bond proposition at the special election provided for in paragraph 6 for the issuance of bonds in such sum as the commission may deem it advisable for the acquisition or construction of the water plant or any part thereof by any of the ways within its powers.

In the light of what has transpired it would no doubt have been better had the commission proceeded under paragraph 8, still it could not know before July 1, 1910, whether the Water Company would accept $7,000,000 in bonds for its plant, and the time between July 1, 1910, and September 6, 1910, the date of the special election, would in our judgment be entirely insufficient to make a careful investigation of the value of the water company's plant, and of the cost of constructing and completing a new water system. Indeed we think that it would have been impossible for the commission to have performed the duties required under paragraph 8 within the time limited. This is demonstrated by the time that it took the engineering committee subsequently appointed to make an investigation of the cost of constructing a new system of waterworks.

So far as mere procedure is concerned we think the commission's failure to act under paragraph 8 was justified. And we are also of the opinion that such failure to act in no wise invalidated the election which was actually held. The language of paragraph 7 is mandatory, and the question upon which the qualified electors were to vote was clearly defined.

[4] It is further claimed that, whether the commission was obliged to follow paragraph 8 or not the failure to make a careful estimate of the cost of constructing a new system of waterworks prior to the special election at which $8,000,000 in bonds were authorized renders the vote nugatory.

The case of Carlson v. City of Helena, 39 Mont. 82, 102 Pac. 39, 17 Ann. Cas. 1233, is cited by appellants to sustain their contentions that the vote by which the taxpaying electors of the city and county of Denver authorized the bonds in question was nugatory, because prior

to said election the public utilities commission had not ascertained that a supply of water could be had, and the probable cost thereof. The case cited was brought by Carlson as a taxpayer and resident of the city of Helena, to restrain the issue of $600,000 of bonds of the city for the purpose of procuring a water supply and installing a system of pipes for its distribution, and $70,000 of bonds for the purpose of extending one of the sewers of said city.

The facts bearing upon the point decided in that case which it is claimed is an authority in the present case were as follows: On March 3, 1908, the mayor and city council of the city of Helena determined that it was for the best interests of the city to own and control its water supply and water system, and that a supply could be obtained from McClellan creek, and brought into the city by an expenditure of $600,000, and also that a needed extension of the sewer system of the city could be effected by an expenditure of $70,000, whereupon the mayor and city council of the city enacted an ordinance reciting these facts and providing for a submission to the taxpayers of the city of the question whether the limit of indebtedness should be extended to procure the funds for these purposes. The ordinance provided that a special election be held in the city of Helena on the 25th day of April, 1908, for the purpose of ascertaining the will of the taxpayers to be affected thereby, as to whether authority should be given and power conferred upon the city council to increase the indebtedness of said city, over and above the 3 per cent. limit fixed by law, by the issuance: (1) Of water bonds of said city to the amount of $600,000, for the purpose of securing a water supply for said city from McClellan creek and constructing a water system for said city; (2) of sewer bonds to the amount of $70,000 for the purpose of sewer extension. The election was held pursuant to the ordinance and it showed a large majority in favor of both bond issues. Thereupon and in pursuance of the authority given by the electors an ordinance was passed providing for the issuance of the bonds. Judgment was entered by the trial court on demurrer for Carlson and the city appealed.

It was contended in the appellate court that the city council had no authority to submit to the electors the question whether a particular water supply must be obtained, or, if it had, that the question could not be submitted in this restricted form until it had first been ascertained that the particular supply was available and what its cost would be. In other words, the contention was that the council was authorized to consult the taxpayers generally as to whether it might proceed to acquire a supply of water for the city, but that it could not divest itself of the discretion vested in it by law as the governing body of the city by leaving it to the electors to select a particular supply, namely, from the waters of McClellan creek. It was claimed that the objection was fundamental because the discretion to procure a particular supply was vested in the council, and that this discretion could not ordinarily be exercised until the council had ascertained that the particular supply was available, and that the cost of acquiring and installing it could be compassed by the amount of the indebtedness to be incurred. The Supreme Court of Montana sustained this contention. The court said:

"If the council should have first ascertained that the particular supply could be acquired, and that the cost of it, together with the cost of installment, is within the compass of the sum which the city can lawfully expend for that purpose, then there could be no possible objection to allowing the voters to speak as to the propriety of securing the particular supply. The council would then have exercised the discretion which is vested in it by law. If, however, all these matters have not already been determined, the vote becomes nugatory, because the assent given by the voters for the acquisition of the particular supply limits the discretion of the council, with the result that if it is thereafter found that the contemplated supply cannot be secured, or that the cost of installment is beyond the financial capacity of the city or not within the compass of the sum secured by the sale of the bonds under the extension already voted, the debt incurred can serve no purpose. It appears from the complaint that the council has authorized condemnation proceedings to acquire the right to the use of the water of McClellan creek, but that these proceedings have not yet been determined. It thus appears, and it is admitted by counsel for appellant, that the cost of acquiring the right has not been ascertained. If the intention to acquire it should be abandoned for any cause hereafter—and it cannot now be surmised what difficulties may be encountered—the city would have in its treasury the money derived from the sale of the bonds, without any use to which the council could devote it. The orderly course of procedure would be to submit the question generally whether the indebtedness, not in excess of a definite amount within the limit, should be incurred; then the council would be left free, in case the indebtedness should be authorized, to use its discretion in securing one supply or another, according as its judgment would dictate. The discretion of the council in this particular is exclusive, and it cannot lawfully divest itself of it by casting it upon the voters, with the probably, or even possibly, absurd consequences to which we have adverted. 28 Cyc. 277, and cases cited in notes; Dillon on Municipal Corporations (4th Ed.) § 96. Having ascertained that a supply can be obtained, the council may then proceed, and under the authority granted by the electors to incur the necessary indebtedness, to issue and sell bonds, acquire any supply which its judgment may dictate, and have it installed so that it may become available. It might, perhaps, be said that the vote upon the submission in its restricted form could not be held binding upon the council in case it should turn out that the right to the use of the water in McClellan creek could not be acquired. This may with equal propriety be answered by the statement that the voters were not asked to extend the limit generally for water supply purposes, and it cannot be said that assent to incur the indebtedness would have been given if the question had been submitted generally, as the statute contemplates. Skinner v. City of Santa Rosa, 107 Cal. 465, 40 Pac. 742, 29 L. R. A. 512."

There can be no question in this case that the submission of the question voted upon to the qualified taxpaying electors in any way interfered with the discretion of the commission or the council of the city and county as to where the supply of water should be obtained, so the case cited is inapplicable on that point. The case, however, does seem to hold that it was necessary for the council of the city of Helena, Mont., before it submitted the bond proposition to a vote of the taxpayers, to have ascertained whether or not a water supply and water system could be obtained and constructed for the sum of $600,000; and one of the grounds upon which the court seems to have held the bonds void was that the council never did ascertain prior to the vote what a water system for the city of Helena would cost. We all must admit that that would be the business way of going about the matter, but where as in the case at bar the charter authorizes the creation of an indebtedness in the sum of $8,000,000 to provide a municipal water plant or system and everything incidental or necessary thereto for

supplying the city and county and all its inhabitants with water for all uses and purposes upon a vote of the taxpaying electors, and the charter further provides that the question shall be submitted as provided in paragraph 6 of 264a, we cannot conclude that the mere failure of the commission to ascertain the probable cost of a new system would render the vote provided by law nugatory. In our judgment section 264a left it to the discretion of the commission whether it should follow paragraph 7 or paragraph 8.

[5] It is further contended that the commission failed and neglected to fix the date, form, and maturity of the $8,000,000 of bonds prior to the special election of September 6, 1910, and that, therefore, the commission has no power to issue the same. It appears that by the ordinance effective January 15, 1914, the council of the city and county fixed the form and date of the bonds. They were to bear date January 1, 1914, and all the installments of said bonds were to mature not later than 30 years from the date of original issue, and all of the bonds should absolutely mature and be payable 30 years after their date. It also appears from the record that while litigation did not prevent the commission from fixing the form, date, and maturity of the bonds prior to the special election, it did cause the delay to a large extent which happened subsequently thereto.

Paragraph 5 of 264a empowers the commission to fix the date, form, and maturity of the bonds without any limitation as to the time it should do so. The taxpaying electors must be charged with a knowledge of this law, and when they voted the bonds they did so charged with such knowledge. The question submitted to the taxpaying electors was the question the law required to be submitted to them and that was sufficient.

[6, 7] Section 6 of Ordinance No. 4, Series of 1914, provides for a tax upon all taxable property in the city and county sufficient to pay the annual interest on said bonds, and to provide a sinking fund to extinguish the principal of said bonds at their maturity.

Section 7 of said ordinance provides that when the water plant or system shall have been constructed that the revenue derived from the operation of said water plant or system, or so much thereof as is not actually needed for the operation and maintenance of the said water plant or system, shall be paid into the treasury of the said city and county for the purpose of creating a sinking fund to extinguish the principal and interest of the said bonds within the said period of thirty years, and that whenever there is any money so paid into the treasury of the city and county from the revenues of the said water plant, then and in that event and until said sums of money are exhausted, no part of the levy provided for in this connection to be levied upon the taxable property of the city and county, shall be utilized in the extinguishment of the principal and interest of said bonds.

It is now contended that the law only authorized the commission to provide for a sinking fund to be created out of the net earnings derived from the operation of the water plant when constructed; and sections 258, 261, and 263 of article 9 of the charter are cited in support of this contention. We infer from the language of the ordinance

that it was the intention of the commission and council to make such a provision for a sinking fund as would render it certain that the bonds with interest would be paid. The ordinance does provide a sinking fund to be paid out of a net revenue arising from the operation of the waterworks system; and it further provides that no part of the levy provided for in section 6 to be levied upon taxable property of the city and county, shall be used where there is sufficient income arising from net revenue.

It is claimed also that the commission ought to have stated in the proposition submitted to the vote of the taxpaying electors how it proposed to create a sinking fund for the payment of the principal and interest of the bonds. So far as submitting the proposition to the electors is concerned the law did not require it, and we may not say the bonds are void, because something was not submitted to the taxpaying electors that the law did not provide should be submitted. Nor can we hold the bonds invalid merely because the commission and council have made a provision for a sinking fund that may not have been necessary. Any irregularity in this respect can be easily corrected by the commission and council.

[8, 9] It is also contended that the public utilities commission has no authority under section 264a to issue what is termed "straight, flat, 30-year bonds," but they were to issue only "call bonds," and that in any event it was the mandatory duty of the commission to determine whether said bonds were to be straight, flat bonds or call bonds prior to the special election. Paragraph 5 of section 264a provides:

"No such bonds shall be used or sold at less than par, nor sold except after advertisement as in this charter provided for the sale of public improvement bonds, and they may be called for redemption by the commission in like manner as provided in section 314."

It is conceded that the commission under the grant of power to say at what time the bonds should mature would have the right to issue straight, flat, 30-year bonds. But it is claimed that the language last quoted restricts and limits the power of the commission in some way so as to deprive them of their authority to issue straight, flat, 30-year bonds. We do not think so, and consider the reasoning to the contrary highly technical. It is insisted, however, that in any event it was the mandatory duty of the commission to determine whether the bonds were to be straight, flat, 30-year bonds or call bonds prior to said election, and to inform the taxpayers thereof. As we have said before there are many things that the commission might have done, but we think it is enough to require them to do what the law commanded, and we find no command in the law for informing the taxpayers of whether the bonds would be straight, flat, 30-year bonds or call bonds.

Very many authorities have been cited by counsel on both sides upon the questions raised on this appeal. They have all been examined and it would extend this opinion to an unwarranted length to review them however briefly. We have found no case where the facts to which the law must be applied were the same as in this case. The most serious question presented is whether or not the issuance of the bonds should be restrained because the sum voted to construct the waterworks sys-

tem is not sufficient to construct a complete system of waterworks, on the theory that the taxpaying voters would not have authorized the issuance of $8,000,000 in bonds to build a waterworks system if they had known that the system could not be built for that money.

[10] After a careful consideration of this question we have concluded that under the facts in this case the court would not be authorized to speculate as to what the taxpaying electors would have done had they known that $8,000,000 would not construct a complete system of waterworks. We are also of the opinion, as before stated, that we are not warranted in construing section 264a, so as to prohibit the construction of a waterworks system unless said system could be built for $8,000,000. It results, therefore, that the court committed no error in excluding the testimony offered at the trial, as it was either irrelevant and immaterial in itself or because as the record already showed the facts desired to be proved, it was merely cumulative.

Judgment affirmed.